**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH RONAU, | ) | CASE NO. 3:25-CV-01807-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I. Introduction

Plaintiff, Joseph Ronau ("Ronau" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

### II. Procedural History

On January 5, 2023, Ronau filed applications for DIB and SSI, alleging a disability onset date of May 1, 2018. (ECF No. 5, PageID #: 76). The applications were denied initially and upon reconsideration, and Ronau requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On August 13, 2024, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*Id.* at PageID #: 100-34). On September

1

16, 2024, the ALJ issued a written decision finding Ronau was not disabled. (*Id.* at PageID #: 76-94). The ALJ's decision became final on July 2, 2025, when the Appeals Council declined further review. (*Id.* at PageID #: 57-60).

On August 29, 2025, Ronau filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 7, 8). Ronau asserts the following assignments of error:

(1) The ALJ improperly rejected PA Bassiouni's more restrictive opinion.

(2) The ALJ improperly based the RFC on his own lay opinion rather than upon substantial evidence.

(ECF No. 7 at 1).

**III. Background**

**A. Relevant Hearing Testimony**

The ALJ summarized the relevant testimony from Ronau's hearing:

> The claimant reports an impaired ability to lift, squat, bend, stand, reach, walk and kneel. The claimant testified that he stopped working because he had crushed his vertebrae at work, and he is unable to work due to his seizures. He is able to bend to tie his shoes but his ability to stand depends on his activity (Testimony). He is not able to walk long distances. The claimant alleged that he is not able to drive due to his seizures (4E/1).
>
> In addition to his physical complaints, the claimant reported that he was also treated for depression and alcohol abuse (Testimony). The claimant related that he does not remember his seizures and estimates that his last seizure was "the other night" (Testimony). He gets distracted easily (Testimony).

(ECF No. 7, PageID #: 83).

**B. Relevant Medical Evidence**

The ALJ also summarized Ronau's health records and symptoms:

> As discussed herein, the claimant was treated for a fall in February

2019. At that time, the claimant disclosed that prior to his fall, he had been ambulatory without an assistive device, was independent with his activities of daily living, was able to do his own homemaking chores, was driving and doing his own shopping and errands, though he was unemployed at that time (1F/962). Computed tomography of cervical spine showed no cervical spine injury (3F/176, dated February 8, 2019). The claimant has an unremarkable computed tomography of brain (3F/175, dated February 4, 2019). Hospital records in April 2019, showed the claimant had normal range of motion, muscle tone, and coordination (3F/511). The claimant's gait was stable and there was a mild tremor (6F/158, dated January 4, 2021).

Notably, the claimant was not assessed with a back related impairment until May 2022, when multiple scans in the emergency department showed thoracic compression fractures (15F/252 and 23F). The claimant reported to his primary care providers that his "crushed vertebrae" was from May 2022 (19F/14). The medical evidence of record showed that in May 2022, the claimant had initially presented to his local emergency department because he had a seizure and found to have a compression fracture of T6 and T11, and a left 8th and possible 9th nondisplaced rib fracture (15F/252, dated May 25, 2022). Imaging studies of his lumbar spine showed a compression fracture of T6 and T11, and he had a left 8th and 9th rib nondisplaced fracture (15F/252). At that time, the claimant was evaluated by Thomas G. Andreshak, M.D., an orthopedic specialist (19F/24, dated May 26, 2022). Dr. Andreshak observed upon examination, the claimant had minimal tenderness to palpation along the thoracic spine, with no focal spinous process tenderness at all (19F/25). He had mild tenderness along the left rib cage, possible from for [sic] a fracture, and could be radiating rib radiculitis from his T6 fracture, with no sternal tenderness with no tenderness on the lumbar spine (19F/25). The claimant has good gross motor strength bilaterally in the upper extremities and lower extremities (19F/24). A computed tomography scan of the thoracic spine showed a new T6 compression deformity, which was new in comparison with his February 4, 2019, imaging studies (19F/44). There were no acute features (19F/44). The claimant also had a T11 fracture, with old changes and nothing acute (19F/25). Dr. Andreshak counseled the claimant that his activity was not specifically limited based on his fracture, as the changes were old, and nothing looked acute. He recommended the claimant follow up in 2 weeks for further imaging studies (15F/252 and 19F/25).

The claimant followed up with Michelle L. Deaton, A.P.R.N.-C.N.P., his primary care provider, in January 2023 (19F). He

reported to Ms. Deaton that he had not followed up with a surgeon (19F/13, dated January 23, 2023). Physical examination at that time showed the claimant exhibited normal range of motion of his back and both shoulders, with no signs of deformity (16F/10). There were no focal neurological deficits, and he ambulated with intact gait (16F/10 and 19F/9). Ms. Deaton advised the claimant that she would obtain record to see what crushed vertebrae he had or whether further radiographs were warranted (19F/14). Ms. Deaton would not prescribe narcotics or opioids given his history of alcohol abuse and recommended that he use Tylenol or ibuprofen to manage his pain (19F/13).

While the claimant maintained that he was unable to work primarily due to his musculoskeletal limitations, there is no record of the use of a medically necessary or prescribed assistive device, physical therapy, emergency room visits, surgery, hospitalization, epidural steroid injections, nerve block treatments, or even a TENS unit. Ms. Bassiouni observed in November 2023, the claimant continued to exhibit stable findings upon examination, as his posture and gait were within normal limits (17F/1). The claimant's limited treatment record supports the determination that he can work at the assigned residual functional capacity.

The claimant has longstanding history of alcohol use. As chronicled in his treatment notes and emergency department records, the claimant presented on various occasions for management of alcohol withdrawal and detoxification, which on occasions necessitated hospitalizations (1F, 3F, 4F, 5F, 10F, 11F, 15F, and 19F). However, the record supports that his treatment was effective in managing his symptoms. Around his alleged onset date, the claimant was hospitalized for severe abdominal pain, and treated for alcohol withdrawal, elevated liver enzymes, and abdominal pain (1F/4-6, dated April 24, 2018). was assessed with severe liver disease secondary to alcohol (19F/27). The claimant reportedly underwent treatment for alcohol abuse at Arrowhead Behavioral Care Center in August 2018 (1F/962).

Thereafter, in October 2018, the claimant was admitted for severe abdominal pain, significant diarrhea and nausea and was clearly jaundiced on admission (1F/332-334, dated October 23, 2018, to November 1, 2018). The claimant had elevated liver enzymes and diarrhea was likely related to pancreatic insufficiency (1F/332). The claimant was treated for hyponatremia, hypomagnesemia, and hypokalemia. He was started on Trental 3 times a day and Creon for pancreatic insufficiency associated with alcohol liver disease. Id. Imaging studies showed heterogeneous appearance of the liver

with findings concerning for early portal hypertension with diffuse ascites noted (1F/333). There was wall thickening identified in the colon and terminal ileum and bibasilar atelectasis (1F/333). The claimant underwent paracentesis on October 25, 2018, which was negative for any bacteria (1F/332). A colonoscopy on October 31, 2018, showed patchy erythema of the cecum and he was placed on a low-fat diet (1F/332-333). He was encouraged to stop alcohol altogether (1F/332). Elastase was ordered and was still pending at the time of discharge. Id. The claimant's hyponatremia remained relatively stable, and his serum sodium level was 130 at discharge (1F/333). A computed tomography abdomen and pelvis showed ascites had resolved since October 23, 2018 (3F/177).

The claimant was treated for a right humerus fracture after he sustained a fall and was treated for alcohol withdrawal (1F/904, dated February 8, 2019). There was severe hepatic steatosis (3F/177, dated February 4, 2019). He was given Precedex. He occasionally attended Alcoholics Anonymous meetings and planned to go back to his meetings (1F/903 and 962). The claimant's liver enzymes had improved on the day of discharge (1F/903).

The claimant was laid off in March 2020 (5F/4), and he reportedly got depressed and was drinking at least 18 12-ounce beers daily (5F/17). The claimant was treated for alcohol withdrawal and detoxification in June 2020 and July 2020 (3F/576, dated June 23, 2020, and 4F/29, and 223-225, dated July 6, 2020, to July 11, 2020). However, the claimant did not utilize more aggressive measures. The claimant responded well with Clinical Institute Withdrawal Assessment (CIWA) protocol (4F/29). At discharge, the claimant was prescribed with Vistaril, thiamine, and Zoloft (4F/29, dated July 12, 2020).

The claimant relapsed 4 months after his discharge in July 2020 (5F/4 and 6F/185). The claimant reported the coronavirus pandemic was a stressor that contributed to his relapse due to "boredom" (5F/4). The claimant was interested in following with Racing for Recovery for outpatient substance use treatment (5F/4). The claimant had been working side jobs since he was laid off in March 2020 (5F/4, dated January 4, 2021). Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

The claimant was treated for alcohol use disorder, with active

withdrawal and detoxification in January 2021 (6F), March 2021 (7F and 8F/51-56, and 115-116), September 2021 (10F; See 10F/346-347), October 2021 (10F, and 11F; See 11F/139-139, dated October 17, 2021, to October 20, 2021), and March 2022 (13F, dated March 19, 2022, to March 21, 2022). He underwent detoxification and participated in unit treatment milieu (e.g. 6F/158, dated January 4, 2021, and 8F/115-116, dated March 2021). He responded to Ativan and diazepam (6F/173). Discharge records show the claimant appeared alert, cooperative, and oriented person, place, and time, and normal speech, volume, thoughts content and psychomotor activity with goal-directed with "ok" memory and concentration (6F/158 and 8F/115-116). The claimant denied having suicidal ideation and homicidal ideation (6F/158, and 8F/115-116). In September 2021, the claimant was undergoing detoxification, but he left medical advice. Mental status examinations at that time showed the claimant was calm, cooperative, oriented person, place, and time, with coherent speech, euthymic mood, and appropriate affect (10F/346, dated September 1, 2021). He had logical thoughts processes, normal content, adequate memory and focus, and no suicidal ideation, homicidal ideation, or psychosis; the claimant had poor insight and judgment as he was leaving against medical advice. Hospital records in September 2021, showed there was no evidence of seizures (10F/346, dated September 1, 2021).

The claimant returned for alcohol withdrawal treatment in October 2021 (10F and 11F). He had been sober and was unable to identify stressors contributing to his relapse (10F/13, dated October 14, 2021). During the interim, he was reportedly still doing side work as an electrician and was open to outpatient treatment (10F/8, dated October 14, 2021). The claimant had fallen while intoxicated and broke his nose, which led him to seek hell [sic] for his alcohol abuse (11F/138- 139, dated October 17, 2021, to October 20, 2021). He required Ativan and Librium, and was transferred to the Step-Down Unit, and did not require any significant Librium and Ativan (11F/138). The claimant was continuously doing better with no signs of active withdrawal. Id. He was advised to follow up with his primary care provider and Alcoholics Anonymous program. Id. At discharge, the claimant was alert, with stable mood, in no visible distress, with intact musculoskeletal examination and non-focal neurological examination. Id. He left against medical advice from the inpatient recovery services (13F/99, dated March 21, 2022).

… During the relevant periods, the claimant presented to the emergency department in April 2022, for after he had a seizure

inside a courthouse (14F/6 and 18, dated April 14, 2022). The claimant exhibited some tremoring on arrival but exhibited no overt seizure activity. Id. An EEG, dated April 8, 2022, showed no epileptiform activities were appreciated (19F/45). He was treated with Keppra and had no further seizures during hospitalization (14F/6). He was treated for hyponatremia and required replacement of electrolytes (14F/6). He was treated with salt tablets, restricted fluid intake, sodium bicarbonate, and potassium replacements (14F/6). The claimant did not wish to go to an in-patient rehabilitation facility (14F/55). He was supposed to be taking his anti-seizure medications and salt tabs, but he had not been taking his medications (23F/1). His sodium levels had improved (23F/1).

The claimant disclosed around this time that he had been staying with family members and not had any alcohol since his discharge on April 14, 2022 (16F/26). The claimant was advised to participate in a detoxification program, and he was re-started on Raxone to help with his alcohol addiction (16F/26). The claimant had marked slowing over the background with a hypnotic sedative medication effect, consistent with an encephalopathy (19F/45). An MRI of the claimant's brain in April 2022, showed the claimant had significant global cerebral atrophy for the claimant's age (19F/34 and 44). There was no cerebellar tonsillar herniation, no intracranial hemorrhage, and no abnormal post-contrast enhancement (19F/44).

Thereafter, the claimant was hospitalized on May 25, 2022, for a seizure and found to have a compression fracture of T6 and T11 (15F/252). He was started on Keppra and CIWA protocol. Id. He had leukopenia, thrombocytopenia, hyponatremia, and elevated liver function testing. Id. He was evaluated by gastroenterology services, who recommended no further intervention other than monitoring his liver function testing. Id. The claimant had not followed up with a gastrointestinal or hepatologist for outpatient treatment until May 2022, when he was evaluated by Scott A. Corman, M.D., a gastroenterologist, Mohammad Hammad Rashid, M.D., a hepatologist, Mohamed J. Hatahet, M.D., a nephrologist, and Syed Zaheer Hasan, M.D., for a consultation (19F/27). The claimant's computed tomography studies of the claimant's abdomen and pelvis showed hepatomegaly and fatty infiltration of the liver, with no significant bowel distension, obstruction, or ascites (19F/27 and 32-33, and 4). Laboratory studies indicated the claimant had chronic liver disease (19F/27). The claimant denied having abdominal pain, or blood in or with his stools. Id. Dr. Corman suspected the claimant had chronic liver disease and

strongly encouraged the claimant to stop drinking and follow-up with him on an outpatient basis (19F/28). Dr. Corman observed in May 2022, the claimant was oriented but a bit slow to respond and had a mild tremor and had mild jaundice (19F/28). Dr. Rashid assessed the claimant with thrombocytopenia due to liver disease and alcohol abuse but noted that he could not exclude all other causes at the time. He noted the claimant's platelet counts in April 2022, were 84,000 on admission and had resolved to 175,000 by the time of discharge (19F/35).

Dr. Hatahet noted the claimant has a history of hyponatremia, with baseline serum sodium levels ranging from 130 to 134 (19F/36 and 37-38). The claimant had acute episodes, which treating provider noted were likely related to the claimant's alcohol abuse. He was diagnosed with hyponatremia in April 2021 (20F/5). The claimant had an episode of hyponatremia in April 2022, when his sodium level had dropped to 123 (20F/5). In May 2022, the claimant had gone back to his baseline serum sodium levels as it was 131, serum potassium 2.9, and magnesium level of 1.5 (19F/37). The claimant's nephrologist, Balhinder S. Brar, M.D., observed the claimant had been treated appropriately with fluid restriction and his sodium improved and he was discharged with salt tablets (16F/20). Dr. Brar noted the claimant's abdomen was soft, nontender, with normal bowel sounds and no organomegaly or ascites (16F/22). The claimant had no cyanosis, clubbing, and edema or neurologist deficits (16F/22). He was alert and oriented person, place, and time. Id. His symptoms were treated with salt tablets, restricted to 1.5L of fluid a day, and advised to abstain from alcohol (16F/24). The claimant was treated with magnesium sulfate and potassium chloride (19F/37). Dr. Hatahet noted the claimant's electrolyte abnormalities were secondary to poor nutrition status, which was exacerbated by diarrhea (19F/38). His renal function was within normal ranges and his potassium and magnesium levels were replaced. Dr. Hatahet recommended the claimant continue taking salt tabs. Id.

… The claimant was supposed to be on Keppra, but he had not been taking his medications (15F/252, dated May 26, 2022). The claimant had a seizure and had been found in a postictal state (15F/252, dated May 26, 2022). The claimant was started on Keppra, started on CIWA protocol, and admitted to the hospital. Dr. Hasan also evaluated the claimant in May 2022, and noted that his neurological examination was nonfocal. A CT of the claimant's brain showed no evidence of hemorrhage, and no acute intracranial pathology (15F/833). He recommended the claimant resumed taking Keppra 500 milligrams two times a day, obtain formal

alcohol rehabilitation, and follow up with his primary care provider (19F/40). The claimant was advised to undergo detoxification, but he did not want to stay for CIWA protocol (15F/252, dated May 26, 2022). Sarmed J. Mansur, M.D., advised the claimant that he would be at higher risk for having seizures and was advised not to drive, operate heavy machinery, or swim due to his risk of seizure breakthrough (15F/252). The claimant's speech was clear and coherent, and there was no facial asymmetry. Id. He had full (5/5) strength in both upper extremities and lower extremities and intact sensation. Id. He was alert, oriented person, place, and time, and appeared anxious. Id.

The claimant's symptoms remained stable with the above therapeutic modalities//continued or worsened despite the above therapeutic modalities. The claimant had recovered, as supported by his normal labs (16F/17, dated June 2, 2022). The claimant had been living with family and stopped drinking (16F/17). The claimant followed up with his primary care provided [sic] in June 2022, after he had relapsed; however, the claimant declined in-patient detoxification (16F/17). At that time, the claimant admitted that he had not picked up his Keppra and had not been taking it (16F/17). The claimant's primary care providers recommended the claimant take Thiamine (Vitamin B) and folic acid and get updated laboratory studies to check his Keppra levels, as well as get a basic metabolic lab work (16F/18). The claimant's Keppra dosage was increased in October 2022 (23F/1).

When the claimant followed up with his primary care providers in January 2023, he was reportedly taking his seizure medications regularly (16F/10). The claimant was referred to a neurologist for seizure follow-up and medication management (19F/11-12). The claimant's lab work showed that his liver enzymes had improved (19F/13).

… In March 2023, the claimant completed an Adult Function report indicating the claimant had no problems attending to his personal care, is able to prepare meals, and does not need reminders to take medications (4E/2-4). He travels by walking and does not drive due to his seizures (4E/5). The claimant shops in stores for clothes and food, counts change, and manages a checkbook and a savings accounts (4E/5). He socializes by phone and in person, texts and hangs out with others (4E/6). He does not need to be reminded to go places, does not need to accompanied, or have problems getting along with family, friends, neighbors, or others (4E/6). He can finish what he starts and can understand written and spoken instructions well (4E/7). The claimant can

9

follow written and spoken instructions and get along with authority figures well (4E/7). He handles stress well and handles changes in routine (4E/8).

The claimant established care with Cassandra Hinders, A.P.R.N., C.N.P., in October 2023 (19F/6-14, dated October 26, 2023). He had previously been a patient of Michelle Deaton, N.P., and he was supposed to see a neurologist for his seizures; however, it had been over a year since he had followed up (19F/7). He had been on Keppra since his first seizure and the seizures reportedly cause him to become unconscious (19F/7). Ms. Hinders referred to pain management for chronic low back pain, and neurology for seizure and Keppra management (19F/12, dated October 26, 2023). Hearing testimony indicated that he had been referred to a pain management specialist, but he had not followed up (Testimony).

Hearing testing [sic] indicated that the claimant later moved in with his parents, including his retired father and his mother, who was unable to leave her bed secondary to a stroke. Hi [sic] ability to perform different household chores, such as doing the laundry and taking out the trash depends on his back pain. However, he is able to help transfer his mom, uses a bench in the shower, and is able to drive to his grandma's farm. He also remained able to hunt and fish (Testimony). The claimant testified that he fished two days before the hearing and he planned to go hunting this season, though he was not going to use a tree stand due to his seizure. …

As for his mental impairments, his symptoms have been maintained minimally with medication therapy. In October 2018, his depressive symptoms were treated with fluoxetine (1F/333). In March 2020, the claimant was taking Zoloft for his depression (4F/17). In March 2021, the claimant's symptoms were treated with Seroquel and Zoloft, and his mood improved, though he had mild anxiety and irritability (8F/140, dated March 9, 2021). The claimant disclosed that his primary care provider had prescribed Zoloft for his depressive symptoms, but he was not taking the medication (10F/366, dated September 1, 2021).

Ms. Deaton managed his depressive symptoms with medications, including trazodone (16F/11, dated January 4, 2023). The claimant disclosed to Ms. Hinders in October 2023, that he was taking Zoloft daily and Trazodone for sleep, and hydroxyzine when needed (19F/7). The claimant denied having thoughts of hurting himself or others (19F/7). Treatment for his depression and anxiety also remained limited. In November 2023, the claimant has not had psychiatric care in the past or any current psychiatric care (17F/2).

10

He denied having suicidal ideation or homicidal ideation (17F/2). Treatment notes show the claimant's managed with Zoloft, Trazodone, and hydroxyzine (19F/7). The claimant takes Zoloft and Trazodone for sleep (19F/7). He uses hydroxyzine when needed and had no thoughts of hurting self or others (19F/7, dated October 26, 2023). The claimant has not required any routine or consistent mental health specific treatment, case management, emergent or recurrent treatment for any acute exacerbations of mental health symptoms or any hospitalizations for periods of mental instability.

… The claimant was alert, cooperative and had appropriate mood and affect (1F/903, dated February 8, 2019). In April 2019, the claimant was alert, oriented person, place, and time, and normal mood, affect, behavior, and thought content (3F/511-512). The claimant in July 2020, was calm and cooperative, and oriented person, place, and time (4F/29). The claimant's mood was anxious, and generally "okay" with congruent affect, with no signs or symptoms of psychosis or mania (4F/29). The claimant had logical thought processes and had normal content (4F/29). The claimant has fair insight and judgment for the need to treatment but was poor by history (4F/29). The claimant had adequate memory and focus (4F/29).

Mental status examinations in January 2021, showed the claimant was appropriately dressed for the weather and location, in no apparent distress, and made eye contact 50 percent of the time and has a cooperative attitude (6F/95). The claimant was awake and oriented person, place, and time, with poor insight and impaired judgment (6F/95). speaks clearly and had coherent, logical and goal directed thought processes, with no paranoid delusions, suicidal ideation, and homicidal ideation (6F/95). The claimant denies auditory or visual hallucinations and did not appear to be responding to internal stimuli (6F/95).

The claimant was stable (11F/138, dated October 25, 2021). He was oriented time, person, place, and event, with "ok" behavior, poor eye contact, intact recent and remote memory, coherent thoughts processes, intact associations, abnormal attention span, concentration, and fund of knowledge (13F/18-19, dated March 20, 2022). The claimant reported a history of depression and anxiety, but in March 2022, the claimant was not engaged in mental health treatment (13F/151). He denied having suicidal ideation, homicidal ideation, visual hallucinations, or auditory hallucinations (13F/151). He was alert, oriented time, person, place, and event, and ambulated with steady gait (13F/99). His primary care

11

provider observed in April 2022, the claimant did not appear ill and was alert, and cooperative, with normal mood (16F/26).

The claimant denied having any depression or anxiety and was alert and oriented time, person, place, and event (19F/37, dated May 26, 2022). He followed commands, moved all four extremities, and answer questions appropriately and had appropriate mood and affect (19F/37- 38, dated May 25, 2022). June 2022 examinations showed the claimant was depressed and tearful as he had resumed drinking; however, the claimant remained alert, oriented person, place, and time, with normal attention and speech, and no auditory hallucinations or visual hallucinations (16F/18).

The claimant was alert, oriented person, place, and time, with normal attention, mood, and speech, and no auditory hallucinations or visual hallucinations (16F/10, dated January 4, 2023). The claimant was alert, oriented person, place, and time, with normal mood, thought content, and judgment (19F/9, dated October 26, 2023). Ms. Bassiouni described the claimant as having fair hygiene and grooming, with average motor behavior and activity level compared to same-age peers and developmental age (17F/1). He was calm, cooperative, pleasant, and relaxed without excessive movement and made regular eye contact during conversation (17F/2). The claimant's mental activity was linear, without tangential or circumstantial thoughts.

Recent examination showed the claimant maintained fair hygiene and grooming. He reported to Ms. Bassiouni that he performed daily chores, tried to cook, attending to his bathing and toileting daily, and enjoyed hunting and fishing (17F/2). The claimant was calm, cooperative, relaxed, and pleasant, with regular eye contact There is no evidence of in-patient psychiatric hospitalizations, emergency room visits, residential services, counseling, extensive case management services, or other intensive forms of intervention. His condition has remained stable, and his doctors have made conservative treatment recommendations

(ECF No. 7, PageID #: 84-91).

## IV.  The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since May 1, 2018, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: compression fracture of the thoracic spine at T6 and T11; seizure disorder; alcohol use disorder, depression, anxiety disorder, and hyponatremia (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: can never climb ladders, ropes, or scaffolds; occasionally balance; avoid all exp to unprotected heights and heavy moving machinery, no commercial driving; can understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line or work requiring hourly production quotas; can occasionally adapt to changes in routine job duties; and can use judgment to make simple, work-related decisions.

    …

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF No. 7, PageID #: 78-79, 82, 93-94).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is

13

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

14

640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Ronau raises two issues on appeal, asserting that (1) the ALJ improperly rejected PA Bassiouni's more restrictive opinion and (2) the ALJ improperly based the RFC on his own lay opinion rather than upon substantial evidence. (ECF No. 7 at 1).

#### 1. Consideration of Bassiouni's opinion

Ronau first challenges the ALJ's consideration of Bassiouni's opinion in formulating the RFC.

Before proceeding to step four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). Under the current regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 416.920c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 416.920c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 416.920c(c). The ALJ is required to explain how he considered the supportability and

15

consistency of a source's medical opinion, but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(2). Under the regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical findings(s) will be." 20 C.F.R. § 416.920c(c)(1)-(2).

Here, the ALJ provided the following explanation of his consideration of Bassiouni's opinion:

> Ms. Bassiouni concluded the claimant can sustain attention in a competitive work environment, get along with co-workers, supervisors, and the public, may have some difficulty tolerating stress associated with work activity due to anxiety but he does take medication for it (17F, dated November 21, 2023). Her opinion is somewhat persuasive though he has limited mental health treatment records to supports the consistency of the findings. However, his conclusion that he may have "some difficulty tolerating stress" is vague because it does not provide specific, functional limitation related to the claimant's ability to perform work-related activities. The limitations to work with no productions rate pace or quotas.

(ECF No. 5, PageID #: 92).

Ronau argues "the ALJ failed to properly consider PA Bassiouni's opinion, improperly rejecting this more restrictive opinion." (ECF No. 7 at 6). Specifically, Ronau argues that the ALJ's rejection of Bassiouni's opinion concerning difficulty tolerating stress associated with work activity based on the opinion being vague and failing to provide specific functional limitations "failed to comport to the regulations, requiring that the ALJ evaluate the opinion's supportability and consistency with the examination and the record." (*Id.* at 8). Plaintiff argues

16

that if the opinion was vague, "[t]his should have prompted the ALJ to recontact PA Bassiouni" since the regulations provide that "the SSA will recontact a consultative examiner for clarification only when the examiner's report is 'inadequate or incomplete.'" (*Id.*).

The Commissioner responds that the ALJ properly found Bassiouni's opinion only somewhat persuasive. (ECF No. 8 at 4). The Commissioner points to the ALJ's conclusion that the opinion was vague and failed to provide specific functional limitations as addressing supportability. (*Id.* at 4-5). The Commissioner argues the ALJ "indirectly addressed the consistency of her opinion by adopting the PAMFs of state agency psychologists Drs. Swain and Kennedy who reviewed her opinion and concluded that Plaintiff could perform 1 to 4 step tasks in a routine work environment that does not require high production or rapid time demands." (*Id.*). Additionally, the Commissioner asserts the ALJ pointed to evidence where Plaintiff reported handling stress well and records describing Plaintiff's anxiety as mild. (*Id.* at 5). The Commissioner further argues that while the regulations allow the ALJ to recontact a medical source, they "do not require an ALJ to obtain further evidence where the record is already sufficient, as it was in this case" since the ALJ's decision was supported by substantial evidence in the form of the State agency psychologists' opinions. (*Id.* at 6 (quotation marks omitted)).

The undersigned agrees with the Commissioner that the ALJ adequately addressed the consistency and supportability factors in explaining why he found Bassiouni's opinion only somewhat persuasive. The ALJ addressed consistency—or whether evidence from other sources supports the opinion—by noting the "limited mental health treatment records." (ECF No. 5, PageID #: 92). By finding that the opinion was vague and lacked specific functional limitations related to Plaintiff's abilities, the ALJ addressed supportability or the lack of explanation for the opinion. (*Id.*). Thus, the ALJ complied with the regulations and substantial evidence supports his

conclusion.

While Plaintiff cites *Dooley v. Commissioner of Social Security*, 565 F. App'x 113, 122 (6th Cir. 2016), to support his position that the ALJ should have recontacted Bassiouni if he found her opinion "inadequate or incomplete," the facts in *Dooley* support that the ALJ had no duty to seek additional information. In *Dooley*, the ALJ rejected physical limitations a physician placed on Dooley as "vague and unsupported by the generally benign clinical signs and symptoms that Dooley exhibited during his physical examination." 565 F. App'x at 122. The appellate court concluded that the relatively normal findings and the doctor's failure to "explain why she had chosen such restrictive limitations for Dooley or quantify the amount of time that he could spend bending, kneeing, or squatting" supported the ALJ's decision to give the opinion little weight. *Id.* Dooley also argued that the ALJ should have contacted the doctor for clarification instead of according her opinion limited weight. *Id.* However, the appellate court rejected this argument, noting that the doctor's opinion, "although inconsistent with the clinical signs and symptoms that Dooley exhibited during his physical examination, was not inadequate or incomplete" because the information within the doctor's report "provided the ALJ with an adequate basis to give limited weight to [the doctor's] assessment of Dooley's physical functioning." *Id.* Similarly, Bassiouni's report contained sufficient information—including her generally normal examination findings—for the ALJ to assess the persuasiveness of the opinion such that the ALJ did not need recontact her for clarification.

Accordingly, the ALJ did not err in considering Bassiouni's opinion.

### 2. Formulation of the RFC

Ronau next argues that "the ALJ improperly relied on his own lay opinion rather than upon substantial evidence, as he rejected the only two physical opinions of record and failed to

18

tether the RFC to substantial evidence of record." (ECF No. 7 at 8). He argues that because the State agency physicians opined that he could perform medium exertion work with additional limitations but the ALJ concluded that the evidence supported restricting Ronau to light work, the ALJ "found this portion of the opinions, at least, unpersuasive." (*Id.* at 9-10). Ronau argues that "the light RFC was left unsupported by substantial evidence, as the ALJ failed to tether this to the record, including Plaintiff's testimony of greater limitations sitting, standing, walking, lifting, and carrying" such that he failed to build a logical bridge between the evidence and his conclusion. (*Id.* at 10).

The Commissioner argues that the ALJ's decision "cleared the only necessary hurdle: it was reasonable and supported by substantial evidence." (ECF No. 8 at 7). The Commissioner asserts that "Plaintiff's argument should be rejected because the RFC limiting Plaintiff was more restrictive than [the State agency opinions] limiting him to medium work" and Plaintiff does not challenge the ALJ's consideration of the opinions. (*Id.*). Additionally, the Commissioner argues that Plaintiff's subjective complaints alone are insufficient to support additional limitations, and the decision should be affirmed because it is supported by substantial evidence, regardless of whether Plaintiff would have weighed the evidence differently. (*Id.* at 8).

> The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician. Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding. Moreover, an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.

*Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citation modified).

The undersigned finds no err in the ALJ's consideration of the State agency opinions in crafting the RFC. The ALJ provided the following discussion of the opinions:

> Sai Nimmagadda, M.D., and Steve McKee, M.D., the State Agency's medical consultants, limited the claimant to medium work with no climbing of ladders, ropes, or scaffolds, occasional balancing, avoid all exposure to no work hazards and no commercial driving (2A and 8A). Their assessment that the claimant would be limited to no climbing ladders, ropes, or scaffolds, and avoid all exposure to work hazards and no commercial driving is persuasive because it considers the claimant's seizures. However, more restrictive residual functional capacity at the light work considers the claimant's impairment-related symptoms in combination, as well as the totality of the evidence including the claimant's treatment history, medication use, and activities of daily living.

(ECF No. 5, PageID #: 92). As this discussion illustrates, the ALJ did not entirely reject the State agency opinions. Rather, the ALJ found certain limitations warranted based on Plaintiff's seizures and adopted these limitations into the RFC but concluded that the overall record supported a more restrictive limitation to light work rather than medium work. (*Id.*). The undersigned sees no reason to "fault the ALJ for finding more restrictions than the state agency reviewers opined," especially given that such a finding is beneficial to Plaintiff. *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) (collecting cases); *see Jessica E. v. Comm'r of the Soc. Sec. Admin.*, No. 2:25-CV-00016, 2026 WL 100726, at *4 (S.D. Ohio Jan. 14, 2026) ("The ALJ adopting most of Dr. Swain's and Dr. Delcour's opinions, with the only deviation being further social interaction limitations for Plaintiff, does not constitute an 'error [that] prejudices a claimant on the merits or deprives the claimant of a substantial right.'"), *report & recommendation adopted sub nom.* 2026 WL 369710 (S.D. Ohio Feb. 10, 2026). Further, "when an ALJ finds more restrictive limitations than any limitations proposed by the medical opinions in the record, if there is an error, the error is surely harmless." *Shawn W. v. Comm'r of Soc. Sec. Admin.*, No. 2:23-CV-4087, 2025 WL 65839, at *4

20

(S.D. Ohio Jan. 10, 2025) (citation modified), *report & recommendation adopted sub nom.* 2025 WL 351042 (S.D. Ohio Jan. 31, 2025).

To the extent Plaintiff argues the ALJ erred in finding he could perform light work, the ALJ's decision as a whole cites substantial evidence to support his conclusion that Plaintiff retained the ability to perform light work. The ALJ cited reports of relatively normal medical findings, including normal range of motion and normal posture and gait. (ECF No. 5, PageID #: 84-85; *see id.* at PageID #: 8284, 8774). The ALJ also cited the "limited treatment record" and lack of evidence "of the use of a medically necessary or prescribed assistive device, physical therapy, emergency room visits, surgery, hospitalization, epidural steroid injections, nerve block treatments, or even a TENS unit." (*Id.* at PageID #: 85). Additionally, the ALJ pointed to Plaintiff's own reports of daily activities, including helping care for family members, hunting, fishing, and working side jobs that, while not rising to the level of substantial gainful activity, indicated his abilities were somewhat greater than he alleged. (*Id.* at PageID #: 86, 89; *see id.* at PageID #: 108, 113, 119, 123, 3033). Because substantial evidence supports the ALJ's RFC determination, the Court must defer to it, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Ronau's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: April 27, 2026

s/ *Carmen E. Henderson*  
CARMEN E. HENDERSON  
U.S. MAGISTRATE JUDGE

21

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).